**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

MARK MERFELD, et al.,

       Plaintiffs,

vs.

DOMETIC CORPORATION,

       Defendant.

No. C16-2096-LTS

**MEMORANDUM OPINION AND
ORDER ON MOTION FOR
SUMMARY JUDGMENT AND
MOTION FOR SANCTIONS FOR
SPOLIATION OF EVIDENCE**

_____

## I.    INTRODUCTION

This action arises from a fire that caused damage to personal property and a structure located in Independence, Iowa. Plaintiffs Mark and Debra Merfeld and Merfeld Transport, Inc., allege that the fire was caused by a defective refrigerator manufactured and sold by defendant Dometic Corporation (Dometic).

This case is currently before me on two motions. The first is Dometic's motion (Doc. No. 26) for summary judgment. Dometic's supporting brief (Doc. No. 26-5) includes, *inter alia*, arguments concerning the alleged spoliation of evidence. Plaintiffs filed a resistance (Doc. No. 36) and Dometic filed a reply (Doc. No. 43-1).

The second, filed the same day, is Dometic's separate motion (Doc. No. 28) for the sanction of dismissal based on spoliation of evidence. In support of this motion, Dometic relies entirely on the spoliation section of its summary judgment brief. *See* Doc. No. 28-1 at 1. Plaintiffs filed a resistance (Doc. No. 33) and Dometic filed a reply (Doc.

No. 35).[1]  I find that oral argument is not necessary on either motion.  Both are fully submitted and ready for decision.

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on August 15, 2016, by filing a complaint (Doc. No. 1) against Dometic.  They allege that on October 10, 2014, plaintiffs Mark and Debra Merfeld owned a 2003 Forest River Cardinal 33TS RV (the RV) and that Dometic had "manufactured, designed and/or assembled refrigerators that were equipped in Forest River's RVs."  Doc. No. 1 at ¶¶ 6, 7, 10.  They further allege that during the relevant time period, Dometic was the "exclusive retailer of Dometic brand refrigerators in the United States" and, upon information and belief, that the RV was "equipped with a refrigerator designed, Manufactured [sic], assembled and sold" by Dometic.  *Id.* at ¶¶ 8-9.

According to the complaint, a failure in the RV's refrigerator caused a fire that consumed the RV and caused damage to a building owned by Mark and Debra Merfeld and to personal property owned by all of the plaintiffs.  *Id.* at ¶ 12.  The complaint includes the following counts against Dometic: (1) negligence in the manufacturing and/or design of the refrigerator, in the construction and/or assembly of the refrigerator and in the distribution of the refrigerator; (2) breach of express and/or implied warranty; (3) post sale failure to warn and (4) strict liability.  *Id.* at pp. 3-4.  Plaintiffs invoke the court's diversity jurisdiction and allege damages in excess of $75,000.  *Id.* at ¶¶ 1-5.

---

[1] In their resistance (Doc. No. 33), plaintiffs argue that Dometic's separate motion for sanctions is improper and should have been brought as a motion for summary judgment (which, of course, it was).  Plaintiffs cite no authority for this proposition.  In fact, Eighth Circuit authority suggests that a request for sanctions based on spoliation may be brought as an independent motion.  *See Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002 (8th Cir. 2006); *Bakhtiari v. Lutz*, 507 F.3d 1132 (8th Cir. 2007); *see also Estate of Seaman ex rel. Seaman v. Hacker Hauling*, 840 F. Supp. 2d 1106 (N.D. Iowa 2011).  In any event, Dometic covered all of its bases by including its spoliation arguments in its summary judgment motion and its sanctions motion.  I will address both motions in this order.

Dometic filed an answer (Doc. No. 5) on September 15, 2016, in which it denies liability and raises various defenses. Dometic then filed the motions at issue on November 27, 2017. In responding to Dometic's summary judgment motion, plaintiffs voluntarily dismissed Count 2 (breach of express and/or implied warranty) and Count 3 (post sale failure to warn). Doc. No. 36-5 at 3 n. 2. Thus, Count 1 (negligent manufacture and/or design) and Count 4 (strict liability) remain for consideration.

## III.   RELEVANT FACTS

The following facts are undisputed except where otherwise noted.

Mark and Debra Merfeld are residents of Iowa and owners of a storage building (the Building) located in Independence, Iowa. They owned personal property in the Building. Merfeld Transport, Inc., is an Iowa corporation that also owned personal property in the Building. The Building was over 12,000 square feet, was wired for electricity and contained numerous vehicles, boats, farm equipment, tractors and other items, including the RV. Debra Merfeld purchased the RV in 2005. The RV contained a refrigerator.[2]

Dometic is a retailer of various products, including refrigerators. Prior to 2009, Dometic purchased refrigerators from Dometic AB, a distinct entity, to sell to its customers. In 2009, Dometic assumed manufacturing responsibilities from Dometic AB.[3] In 2006, and again in 2007 or 2008, Dometic issued a recall for Dometic brand RV refrigerators.

On October 11, 2014, a fire occurred at the Building. The fire caused damage to the RV, the Building, and other personal property stored in the Building, with the dollar

---

[2] The parties dispute whether the refrigerator has been identified as a Dometic brand refrigerator.

[3] As will be discussed further below, the parties dispute whether Dometic had some role in manufacturing and/or designing refrigerators prior to 2009.

value of the loss allegedly reaching at least $1.5 million.[4]  At the time of the fire, plaintiffs were insured by State Farm Fire and Casualty Company (State Farm).  State Farm retained George Howe, a fire investigator, to determine the cause of the fire.

Howe viewed the scene for the first time on October 14, 2014.  He did not conduct a thorough investigation at the time, as he intended to wait for a joint inspection with representatives of parties who may have been responsible for the fire.  On October 16, 2014, State Farm sent a notice of claim and inspection to Dometic.  This notice stated that Dometic may be responsible for the loss and invited Dometic to send a representative to participate in the joint inspection, which was scheduled to take place on November 4, 2014.

Before the joint inspection took place, Mark Merfeld and his son Ryan Merfeld, along with other individuals, removed debris from the north, east and west sides of the Building, up to the area in which the RV was located.  Some cleanup also occurred on the south side of the building, without disturbing the RV.  A substantial amount of debris was removed from the scene before the joint inspection occurred.

Additional facts will be addressed as necessary, below.

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] The precise amount of the loss is unclear.  Dometic claims it is over $1.5 million.  Doc. No. 26-5 at 5.  Plaintiffs claim it is over $1.7 million.  Doc. No. 36-5 at 3.  The exact number is immaterial for purposes of the pending motions.

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V.    DISCUSSION

State law applies to products liability actions based on diversity. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 916 (8th Cir. 2017). Thus, Iowa law applies to this action. As noted above, the remaining causes of action are (1) strict liability and (2) negligence in the manufacturing and/or design of the refrigerator, construction and/or assembly of the refrigerator and distribution of the refrigerator. However, Iowa law has essentially eliminated the distinction between negligence and strict liability for product defect claims. *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 643 (N.D. Iowa 2011). With regard to design defect claims, the Iowa Supreme Court has held that it is improper to submit a strict liability claim and a negligence claim premised on the same alleged defect to a jury. *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002). Instead, the court directed that a claim based on a defective product design be labeled as a "design defect claim without reference to strict liability or negligence principles." *Id.*

In seeking summary judgment on the remaining claims, Dometic relies primarily on the statutory immunity set forth in Iowa Code § 618.13. Dometic makes various other, alternative arguments, including its argument for dismissal based on spoliation of evidence. I will begin by addressing the statutory immunity issue.

6

*A.*  *Statutory Immunity*

*1.*  *Parties' arguments*

Dometic argues that it is entitled to summary judgment on plaintiffs' product defect claims because Dometic was not the manufacturer, designer or assembler of the refrigerator and thus enjoys immunity under Iowa Code § 613.18(1).  Doc. No. 26-5 at 7.  Dometic argues that it did not start manufacturing refrigerators until 2009, while the refrigerator present in the 2003 RV would have been manufactured no later than 2003. *Id.* at 9–10.

Plaintiffs respond that the statute does not grant Dometic immunity from liability because there is a question of material fact as to whether Dometic was a manufacturer or designer of the refrigerator.  Doc. No. 36-5 at 2.  They argue that Dometic's Director of Engineering, Patrick McConnell, was closely involved with the Dometic AB design team, and his involvement essentially made Dometic a manufacturer such that it is disqualified from the statutory protection.  *Id.* at 2–3, 5-9, 14.  Plaintiffs also argue that Dometic admitted it was the manufacturer when it issued the product recall, such that for consumer purposes it is liable as a manufacturer under the apparent manufacturer doctrine.  *Id.* at 9–10, 12–13.

In response, Dometic contends there is no evidence that input from McConnell contributed in any way to the alleged defect.  Doc. No. 43-1 at 8.  Dometic also argues that the apparent manufacturer doctrine is not currently viable under Iowa law and is inconsistent with the language of Section 613.18.  *Id.* at 2–3.  Finally, Dometic contends that even if the doctrine is viable, it would not apply under these facts.  *Id.* at 4.

*2.*  *Analysis*

Iowa Code § 613.18 states, in relevant part:

1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:

a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

b. Not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability for the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

2. A person who is a retailer of a product and who assembles a product, such assembly having no causal relationship to the injury from which the claim arises, is not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability which arises from an alleged defect in the original design or manufacture of the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

Iowa Code Ann. § 613.18 (2017). If the claim arises "solely from an alleged defect in the original design or manufacture of the product," then subsection 613.18(1)(a) applies. *Nationwide*, 816 F. Supp. 2d at 645 (quoting *Bingham v. Marshall & Huschart Mach. Co., Inc.*, 485 N.W.2d 78, 80 (Iowa 1992)).[5] Subsection 613.18(1)(b) applies if the claim does not arise solely from an alleged defect in the original design or manufacture, such as a claim for failure to warn. *Id.* Further, "[t]he immunity provided by subsection 613.18(1)(a) is not dependent upon proof that the manufacturer . . . is subject to the

---

[5] As noted above, with regard to a design defect claim the Iowa Supreme Court has eliminated the labels of strict liability and negligence, instead directing that the claim be designated "as a design defect claim without reference to strict liability or negligence." Wright, 652 N.W.2d at 169. The Court also noted that the elements of a design defect claim are based on negligence principles. *Id.* at 168. Because § 613.18(1) provides immunity only with regard to "any suit based upon strict liability in tort or breach of implied warranty of merchantability," there is some question of whether design defect claims still fall within the scope of the statutory immunity. *See, e.g., Anderson v. Kmart Corp.*, No. 4:13-cv-00216-RAW, 2014 WL 11514683 at *4 (S.D. Iowa Oct. 20, 2014) (identifying the issue without deciding it). As in *Anderson*, the parties have not briefed the question of whether design defect claims in the post-*Wright* era are subject to § 613.18. I do note that the statute itself refers to "an alleged defect in the original *design* or manufacture of the product." Iowa Code § 613.18(1)(a) (emphasis added). Absent further clarification from the Iowa Supreme Court, I will assume that the design defect claim plaintiffs assert in this case is subject to § 613.18(1).

jurisdiction" of the court, meaning subsection (1)(b) is not a limitation on subsection (1)(a) immunity. *Id.* Subsection 613.18(2) applies to retailers who assemble the products they sell. *Id.*

Here, plaintiffs' remaining claims arise solely from an alleged defect in the original design or manufacture of the product at issue. Therefore, the question is whether Dometic qualifies as a manufacturer or designer under Subsection 613.18(1)(a). *See Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 327 (Iowa 1996) (under the statute, neither designers nor manufacturers are immune from strict liability claims). Plaintiffs' arguments tend to conflate manufacturer with designer. However, the purpose of § 613.18 is to ensure that liability extends only to those who have "some responsibility for the design or manufacture of a product." *Housley v. Orteck Int'l, Inc.*, 488 F. Supp. 2d 819, 832 (S.D. Iowa 2007) (quoting *Stoffel v. Thermogas Co.*, 998 F. Supp. 1021, 1031 (N.D. Iowa 1997)). Therefore, the kind of defect claims plaintiffs may bring against Dometic depends on what role Dometic played. *Stoffel*, 998 F. Supp. at 1033 ("If a defendant's only role was to design the product, only a design defect claim may be brought. If a defendant both designed and manufactured a product, then either a design defect or a manufacturing defect claim, or both, may be brought.").

### a.    Was Dometic a manufacturer?

The statute does not define "manufacturer." Therefore, I must rely on the common definition. *See Nationwide*, 816 F. Supp. 2d at 648 (relying on dictionary definitions of "manufacture" and "design" because the statute lacks a definition). To manufacture means "to make into a product suitable for use," "to make from raw materials by hand or by machinery," or to "invent, fabricate." *Id.* at 648 n.5 (quoting Merriam Webster's Collegiate Dictionary 709 (10th ed. 1995)).

To argue that Dometic was a manufacturer of the refrigerator at issue, plaintiffs rely on a letter from Patrick McConnell, Dometic's Director of Engineering, to the National Highway Traffic Safety Administration (NHTSA) Office of Defects

Investigation Enforcement. The letter stated that Dometic had manufactured and sold certain refrigerators with defects. Doc. No. 36-5 at 8; Doc. No. 36-1 at 13. The recall letter Dometic sent to its customers also stated that a defect was found in "refrigerators that it manufactured." Doc. No. 36-1 at 15.

Dometic, however, cites the testimony of David Fuller, its general counsel, to demonstrate that it was not a manufacturer or designer of the refrigerator in question. Doc. No. 26-5 at 10. Fuller testified that Dometic did not start manufacturing RV refrigerators until 2009. Doc. No. 26-2 at 29, 31, 36. Until that time, Dometic AB was the manufacturer and Dometic was a selling company only. *Id.* at 31, 32. Fuller also testified that the statements in the recall notice about Dometic being the manufacturer were wrong and stated "relative to the recall, it doesn't matter what the public was told." *Id.* at 34. McConnell similarly testified that Dometic did not manufacture refrigerators until 2009 or 2010 and that the designation of Dometic as the manufacturer in the recall notice was an error. *Id.* at 41, 43, 52. Roy Leitch, a specialty sales and product manager with Dometic, testified that manufacturing refrigerators was a new undertaking for Dometic in 2009. *Id.* at 56.

Apart from the statements in the recall notice and the NHTSA letter, there is no evidence that Dometic actually had a role in the manufacturing process before 2009. Indeed, plaintiffs admit that "manufacturing responsibilities shifted to Dometic Corporation in 2009" and that the refrigerator in the RV could not have been manufactured later than 2003. Doc. Nos. 36 at 5; 26-1 at 9. Thus, I find no genuine issue of material fact on the question of whether Dometic was involved in manufacturing the refrigerator at issue in this case. It was not.

While Dometic did not manufacture the refrigerator, plaintiffs cite *Tice v. Wilmington Chem. Corp.*, 141 N.W.2d 616 (Iowa 1966), to argue that under the apparent manufacturer doctrine, Dometic should be treated as the manufacturer for purposes of § 613.18. In *Tice*, the Iowa Supreme Court noted that in a prior case, it had "by reference adopted the precepts set forth in Restatement of the Law of Torts, sections 388, 400, 401

and 402, holding in brief that one who puts out as his own a chattel manufactured by another is subject to the same liability as though he had in fact manufactured the product." *Id*. at 628 (citing *Rauch v. American Radiator & Standard San. Corp.*, 104 N.W.2d 607 (Iowa 1960)).

A similar argument was made in *Allianz Global Corp. v. Watts Regulator Co.*, No. 4:14-CV-00253, 2016 WL 4435094 (S.D. Iowa Apr. 7, 2016). The *Allianz* court noted that in *Wright*, the Iowa Supreme Court "abandoned at least one of the Restatement sections cited in *Tice* in favor of the Restatement (Third) of Torts: Products Liability section 1 and 2, which does not contain a similar provision." *Id*. at *5 n.2. Thus, the court determined it to be unclear whether the apparent manufacturer doctrine "even remains cognizable under Iowa law." *Id.*

I agree that the status of the doctrine under Iowa law is not entirely clear. The Restatement (Third) did retain the common law apparent manufacturer doctrine in Section 14, which provides that "one engaged in the business of selling or otherwise distributing products who sells or distributes as its own a product manufactured by another is subject to the same liability as though the seller or distributor were the product's manufacturer." Restatement (Third) of Torts: Products Liability § 14 (1998). However, the Iowa Supreme Court did not adopt Section 14 in *Wright* and has not addressed the apparent manufacturer doctrine in the 50-plus years since *Tice*.

The doctrine makes an entity strictly liable for manufacturing and design defects, even if it was not responsible for those defects, so long as the entity represented to the public that it is the manufacturer. Doc. No. 36-5; *Tice*, 141 N.W.2d at 628. This doctrine is consistent with the common law principles of product liability. *See* Restatement (Third) of Torts: Products Liability §§ 1 cmt. e; 2 cmt. o. However, the Restatement (Third) recognizes that some states have altered the common law on this issue, noting that "many jurisdictions by statute treat nonmanufacturers more leniently," and "to the extent that a statute specifies responsibilities, the statutory terms control." *Id*. § 14 cmt. b.

Here, plaintiffs argue that Iowa Code § 613.18 "embodies the Apparent Manufacturer Doctrine." Doc. No. 36-5 at 12. I disagree. Section 613.18 was enacted in 1986, long after *Tice*. Rather than codifying *Tice*'s holding that a seller or distributor bears the same liability as a product's manufacturer, § 613.18 expressly immunizes one who "wholesales, retails, distributes, or otherwise sells a product" from various claims under specified circumstances. Iowa Code § 613.18(1)-(2). The statute does not create an exception for nonmanufacturing sellers that hold themselves out as manufacturers of a product.[6]

As noted above, the Iowa statute does not define "manufacturer." The common dictionary definition does not encompass a non-manufacturer that holds itself out as being the manufacturer. Thus, I find that the apparent manufacturer doctrine does not create an exception to § 613.18 and is not viable under Iowa law. As a matter of law, Dometic was not a "manufacturer" of the refrigerator for purposes of the statute.

### b.    Was Dometic a designer?

The statute likewise does not define "designer." The common dictionary definition of "design" is "to create, fashion, execute, or construct according to plan: devise, contrive." *See, e.g.*, *Nationwide*, 816 F. Supp. 2d at 648 n.5 (quoting Merriam Webster's Collegiate Dictionary 709 (10th ed. 1995)). In *Nationwide*, the court noted that a purchaser who provides a manufacturer with desired product specifications (such as height, capacity, usage rate, etc.) for the manufacturer to use in designing, assembling and constructing a product is not a "designer" within the meaning of the statute. *Id*. The

---

[6] Notably, some states enacting similar statutes have included such exceptions. *See* Kan. Stat. Ann. § 60-3302 (2017) ("manufacturer" definition includes a product seller that holds itself out as a manufacturer); Idaho Code Ann. § 6-1402 (2017) (same); La. Rev. Stat. Ann. §9:2800.53(1)(a) (2017) (same); Wash. Rev. Code Ann. §7.72.040(2)(e)(2017) (stating that a nonmanufacturing product seller shall have the same liability as a manufacture if the product was marketed under a trade or brand name of the product seller).

court explained that such conduct "is simply providing the information any purchaser would provide to get a product designed to meet its requirements, not fabricating the necessary apparatus from raw materials or conceiving or devising the necessary apparatus to fulfill the function." *Id.*

By contrast, the *Allianz* court found a genuine issue of material fact as to whether the defendant "designed" the product at issue. 2016 WL 4435094, at *5. Allianz sought damages from Watts after a water leak that was caused by a failed part known as a wye strainer. *Id.* at *1. The court explained the situation as follows:

> The . . . wye strainers were manufactured by a Taiwanese company called Fortune Manufacturing Co., Ltd. ("Fortune") at Watts' request with the understanding that the parts would be resold to Watts' customers. When establishing a business relationship with Fortune, Watts provided Fortune with exemplars of a similar wye strainer it had previously purchased from a different supplier. Fortune then used that exemplar to develop and manufacture the wye strainer at issue here. The parties dispute whether Watts, or only Fortune, should be considered the designer of the wye strainer, and whether Watts had input on the material composition used in the manufacturing process.

*Id.* (record citations omitted).

The court described deposition testimony from Watts employees suggesting that Watts had a significant role in the design of the product, including the material composition of the strainer. *Id.* at 5. For example, Watts' Director of Engineering testified that Watts had an employee who reviewed and approved Fortune's assembly drawing for the strainer, that Watts had to approve any changes Fortune made to the design and that Watts could have asked for changes in the material composition of the product. *Id.* at *5. Based on this evidence, the court thus found that Watts "did more than just provide specifications" and had at least some responsibility for and control over the design of the product, thus creating a question of material fact as to whether Watts was a "designer" of the strainer for purposes of § 613.18. *Id.*

Here, plaintiffs cite the deposition testimony of Patrick McConnell to argue that there is a question of material fact as to whether Dometic is a designer of the refrigerator at issue. Doc. No. 36-5 at 2, 5–9.[7] McConnell testified that the RV refrigerators were manufactured by Dometic AB but that he, as a Dometic employee, identified North American safety standards and reviewed samples sent by Dometic AB to ensure the designs complied with those safety standards. Doc. No. 36-1 at 6. Once Dometic AB finished manufacturing and testing the product in Sweden, it sent the product to McConnell, who tested it again. *Id.* at 7. McConnell also attended "aesthetic design meetings" in Sweden, during which the sales team had input on the look, colors and texture of the product and he addressed how the aesthetic decisions affected the safety requirements. *Id.* at 8. However, he answered affirmatively when asked if he was "just there to observe . . . the input that was being put out there, as opposed to giving [his] own opinions . . . about the look, the colors, and the textures." *Id.* at 10.

McConnell's testimony reflects a level of involvement in product design that is not as extensive as that in *Allianz*, but nonetheless more significant than merely providing specifications. Additional analysis is necessary to determine whether that involvement disqualifies Dometic from statutory immunity as a "designer" under the facts of this case. In applying § 613.18(1)(a), the Iowa Supreme Court focuses on the defendant's role with regard to the dangerous condition of the product. In *Kolarik v. Cory Intern. Corp*, 721 N.W.2d 159 (Iowa 2006), the Court considered claims brought by a plaintiff who suffered a dental injury after biting an olive that contained a pit or pit fragment. *Id.* at 161. The defendants were importers and wholesalers of the olives, which had been imported from Spain. *Id.*

In arguing that the defendants were not entitled to immunity under § 613.18(1)(a), the plaintiff asserted that they were "assemblers" because they removed bulk olives from

---

[7] McConnell's deposition was taken in another case, *Bowman v. Dometic Corp.*, 4:15-CV-00089-SMR-HCA in the United States District Court for the Southern District of Iowa (decision on motion to dismiss reported at 2015 WL 11117319 (S.D. Iowa Dec. 22, 2015)).

drums and repackaged the olives into jars. *Id*. at 162. In disagreeing, the Court explained:

> We are convinced that the assemblers' exclusion contained in section 613.18(1)(a) is aimed at those situations in which an assembling process has some causal connection to a dangerous condition in the product that gives rise to a strict-liability claim or a product condition that constitutes a breach of an implied warranty of merchantability. *Because the repackaging of the olives by defendants did not contribute to the condition that underlies plaintiff's product-liability claim, defendants are afforded the immunity granted by the statute*.

*Id*. (emphasis added).

While *Kolarik* addressed the role of "assembler" under § 613.18(1)(a), rather than that of "designer," I find no basis for analyzing the roles distinctly. Just as one who has some role in the assembly process retains statutory immunity absent some contribution to the product's dangerous condition, the same concept logically applies to one who has some role in the design process. Here, then, Dometic's limited involvement in the design of the refrigerators manufactured by Dometic AB cannot deprive Dometic of statutory immunity absent evidence that Dometic's activities "contribute[d] to the condition that underlies" plaintiffs' claims.

That condition involves the refrigerator's boiler tube. The recall notice Dometic issued for Forest River RVs in 2007 stated that the refrigerators in certain RVs "may have a defect in the boiler tube" and "pressurized coolant solution could be released into an area where an ignition source (gas flame) is present." Doc. No. 36-2 at 186. This notice also stated that the release of the coolant under certain conditions could result in a fire. *Id*. Dometic's recall notice issued in 2006 stated that the potential defect in the refrigerators is "associated with [the] cooling unit at the back" and that some of the "potentially affected refrigerators have experienced a fatigue crack that may develop in the boiler tube in the area of the weld between the boiler tube and the heater pocket." Doc. No. 26-2 at 14. The notice stated that this defect may release coolant into an area where an ignition source is present. *Id*.

Plaintiffs' experts state that the RV refrigerator at issue in this case experienced a failure in the boiler section. Doc. No. 36-1 at 38. Specifically, corrosion of the boiler tube allowed combustible gases to be released and ignite, causing the fire. Doc. No. 36-2 at 161; 36-1 at 71–72, 76, 85; 36-1 at 38; 36-3 at 2. Thus, the alleged defect in this case, according to plaintiffs' experts, relates to the refrigerator's boiler tube.

As described above, McConnell, on behalf of Dometic, had some limited involvement in design-related activities with regard to refrigerators made and sold by Dometic AB. However, the record contains no evidence that McConnell's activities related in any way to the boiler tube. Nor is there any other evidence suggesting that Dometic had any role in designing the boiler tube or otherwise "contribute[d] to the condition that underlies" plaintiffs' claims. As such, I find as a matter of law that Dometic was not a "designer" within the meaning of Iowa Code § 613.18(1)(a).

Because Dometic was neither a "manufacturer" nor a "designer," it is entitled to statutory immunity under Iowa law as to plaintiffs' product defect claims. This leaves for consideration only plaintiffs' claims for negligent assembly and negligent distribution.

## B.    *Remaining Negligence Claims*

Apart from their product defect claims, plaintiffs claim Dometic was negligent in the assembly and distribution of the refrigerator. However, plaintiffs do not dispute that Dometic did not assemble the refrigerator. As such, I will grant summary judgment in Dometic's favor on the negligent assembly claim.

As for negligent distribution, Dometic argues that Iowa law does not recognize a cause of action against a seller for "negligent distribution" and notes that plaintiffs have not presented any evidence supporting such a claim, even if it exists. *Id.* at 15–16. Plaintiffs did not respond to Dometic's arguments as to this claim. As such, I need not delve into the question of whether a claim of negligent distribution is available under Iowa law. I will grant Dometic's motion for summary judgment on the negligent distribution claim.

## C.   Spoliation of Evidence

The conclusions set forth above dispose of all plaintiffs' remaining claims.  Thus, Dometic's arguments for dismissal based on spoliation of evidence are largely moot.  However, I will address that issue to determine whether an alternative basis exists for dismissing this case.

### 1.   Parties' arguments

Dometic argues that dismissal is warranted because plaintiffs intentionally destroyed evidence to suppress the truth by cleaning up the northern, eastern and western areas of the building before the joint inspection that was scheduled for November 4, 2014.  Doc. No. 26-5 at 19–20.  Dometic contends that Mark Merfeld intentionally destroyed evidence after George Howe instructed him not to touch the fire scene.  *Id.* at 27.  Dometic then argues that the cleanup was prejudicial because its experts did not have the opportunity to examine potential alternative sources of origin for the fire, other than the RV.  *Id.* at 33–35, 39.  Dometic defines the fire scene as the entire building and claims that any destruction of that scene creates prejudice.  *Id.*

Plaintiffs argue that there was no spoliation of evidence because (1) the fire scene is limited only to the RV, not the entire building and (2) Merfeld did not intend to destroy evidence when he cleaned the northern, eastern and western areas of the building.[8]  Doc. No. 36-5 at 18, 19, 24.

### 2.   Analysis

"Spoliation" is the "intentional destruction, mutilation, alteration or concealment of evidence."  *Spoliation*, Black's Law Dictionary (10th ed. 2014).  In diversity cases, federal law applies to sanctions imposed for the spoliation of evidence.  *Sherman v.*

---

[8] Plaintiffs make a third argument, that dismissal is not favored under Iowa law, but as noted in the following section, federal law governs the sanctions available for a finding of spoliation.

*Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012). District courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." *Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). Dismissal is warranted only if the court finds that the plaintiffs intentionally destroyed evidence in such a way that "indicat[es] a desire to suppress the truth." *Id.*; *Menz v. New Holland North America, Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006).[9] This standard is higher than the "knew or should have known" negligence standard sometimes used by other courts. *See Rattray v. Woodbury Cty., Iowa*, 761 F. Supp. 2d 836, 845 (N.D. Iowa 2010). To warrant dismissal, Dometic also must show that it has been prejudiced by the destruction of the evidence. *Estate of Seaman ex rel. Seaman v. Hacker Hauling*, 840 F. Supp. 2d 1106, 1115 (N.D. Iowa 2011).

### a.    Intent

A court has "substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses . . . and other factors." *Estate of Seaman*, 840 F. Supp. 2d at 1115. The ultimate focus is whether there was "intentional destruction of evidence indicating a desire to suppress the truth" and not simply that the parties were aware of the prospect of litigation. *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007). In *Stevenson*, the Eighth Circuit addressed a situation that "tests the limits" of what actions qualify as bad faith, or intentional destruction. 354 F.3d at 747–48. In that case, the defendant railroad destroyed a voice recording pursuant to its routine retention policy, but had general

---

[9] A finding of intentional destruction is also necessary to warrant an adverse inference instruction. *Menz*, 440 F.3d at 1006; *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 879 (8th Cir. 2015). Other sanctions may be imposed without a finding of intentional destruction, such as prohibiting the party from introducing certain evidence or expert testimony. *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 747 n.2 (8th Cir. 2004).

knowledge that such recordings would be important in any litigation in which an accident resulted in death or serious injury. *Id.* at 748. A claims representative for the railroad received notice of the accident at issue shortly after it occurred and started an investigation. *Id.* at 747. The recording at issue was the only contemporaneous recording of the accident. *Id.* at 748. Further, the railroad made immediate efforts to preserve other types of evidence, but not the voice recording, and had made efforts to preserve voice recordings in other cases when doing so was beneficial to the railroad. *Id.* The court found that "[t]he prelitigation destruction of the voice tape in this combination of circumstances, though done pursuant to a routine retention policy, creates a sufficiently strong inference of an intent to destroy it for the purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident." *Id.*

Here, the fire occurred on October 11, 2014. Doc. No. 26-1 at 1. Plaintiffs' insurance adjuster, Brooks Combs of State Farm, met the plaintiffs at the Building on October 12, 2014. *Id.* at 17. State Farm's fire investigator, George Howe, viewed the Building on October 14, 2014. *Id.* at 14. He did not conduct a thorough investigation, but took some pictures and examined one outlet. *Id.* at 11. On October 16, 2014, State Farm sent a Notice of Claim and Inspection to Dometic, indicating that Dometic may be responsible for the property loss at the building. *Id.* at 12. A joint inspection was scheduled for November 4, 2014. *Id.* Mark Merfeld knew the joint inspection was scheduled for November 4. *Id.* at 15.

Sometime in October, Mark Merfeld and others began cleaning up debris from the building. Doc. Nos. 26-2 at 115; 26-3 at 9. Ryan Merfeld, Mark Merfeld's son, estimated that twenty 40-foot semi-trailers of material were removed and between 20–30 people came through the Building prior to the inspection. Doc. No. 26-1 at 12. The RV itself was preserved and covered with tarp during the cleanup. Doc. No. 36-3 at 168. The parties agree that the Building had been substantially altered when the November 4 inspection occurred. *Id.* at 14. The parties also agree that Combs and Howe directed Mark Merfeld not to alter the scene in any way before the joint inspection. Doc. Nos.

26-3 at 28, 30–31. Howe also suggested to Merfeld that the RV and the area between the RV and the wall be covered with tarp in order to preserve it. Doc. No. 26-2 at 90, 91.

However, despite the initial instructions not to disturb the fire scene, at some point after the fire – but before the joint inspection – Combs and Howe told Mark Merfeld that he could do some cleanup in the building. Doc. No. 26-3 at 33, 34. Combs testified that the cleanup authorization was to knock down a dangerous wall on the north end of the building. *Id.* at 34. He claims that he did not authorize a cleanup to the extent that the building was ultimately cleaned. *Id.* at 33–34

Howe's testimony about what he told Mark Merfeld is similar. Doc. No. 26-2 at 89, 90. Howe stated that he authorized Mark Merfeld to inventory a portion of the building and "to just stay away from the area around the RV." *Id.* at 94. He also said the Merfelds could knock down a precarious wall on the north side of the building. *Id.* However, he testified that he did not believe the conversation authorized Mark Merfeld to remove and dispose of the physical debris to the extent it was ultimately cleaned. *Id.*

Mark Merfeld testified that he cleaned up some "trash and fire debris" but, to his knowledge, did not remove or destroy evidence because any items found in or around the location of the fire, the RV, were preserved. Doc. No. 36-1 at 20. He stated that he was instructed not to clean up anything in the first days after the fire and did not do so, but then Combs gave him permission to "clean up everything up to the point and around" the RV. Doc. No. 36-3 at 171, 173. He also stated that he retained items from the north area of the building for further investigation. *Id.* at 173.

Ryan Merfeld testified that they put the tarp on the RV because they were not allowed to touch it during the cleanup, as they were instructed to keep everything the same. *Id.* at 168. He also testified that they were told to keep the side near the RV, the south wall, intact because of the "electricity . . . just in case they found something over there," but they were allowed to clean up everything else. *Id.* He stated they were never told specifically not to disturb the scene to the east, north or west side of the RV. *Id.*

Under these circumstances, it is clear that State Farm's directives to the Merfelds were unclear and, indeed, bordered on the ridiculous. With a joint inspection already scheduled, it is absurd that State Farm authorized its insureds to take any action concerning the Building. However, the evidence does not permit a finding of intentional destruction of evidence *for the purpose of suppressing the truth*. Plaintiffs held off on doing any work with regard to the Building until they received permission from Combs. The extensive cleanup work that followed arose from a miscommunication about the scope of the area plaintiffs were authorized to clean. There is no evidence that either State Farm or the Merfelds acted with the intent to destroy evidence that would have revealed an alternative cause of the fire.

### b.    Prejudice

While I have already found that dismissal is not appropriate, I will briefly address the issue of prejudice. Prejudice may be shown simply by the nature of the evidence that was destroyed. *Stevenson*, 354 F.3d at 748. The destroyed evidence need not be a "smoking gun" to be prejudicial. *Rattray*, 761 F. Supp. 2d at 845–46. There is no prejudice if there is no support for the speculation that the destroyed evidence would have affected the litigation. *Gallagher*, 619 F.3d at 844; *See also Koons v. Aventis Pharm., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004). If the missing evidence would be different or more helpful to the party claiming spoliation than the evidence that already exists, there is likely prejudice. *See Cedar Rapids Lodge & Suites, LLC v. JFS Dev., Inc.*, No. 09-CV-175-LRR, 2011 WL 5975127, at *6 (N.D. Iowa Nov. 29, 2011).

Both parties agree that disturbing a fire scene can compromise the investigation. Doc. Nos. 26-1 at 23; 36 at 11. Due to the cleanup, Dometic was unable to perform a thorough inspection of other areas of the building to determine whether there was an alternative origin point for the fire. Walter Oliveaux, Dometic's fire inspector, stated in his report that testing of other possible fire origins was not possible due to the extent of cleaning. *Id.* at 107–08. He suggested that another person, Steve Bonefas, could have

been responsible for the ignition because he was at the building during the day of the fire and was a smoker, but it was not possible to confirm this. *Id.* at 106–08. Derek Starr, another fire investigator for Dometic, stated that the alteration to the building made it impossible to test alternative origin hypotheses. *Id.* at 91.

Plaintiffs argue that eyewitness testimony confirms that the fire started at the RV. Doc. No. 36-5 at 24. Marvel Van Note testified that she first observed the fire "underneath the camper on the north side and flames coming out of the top of the north side of the camper." Doc. No. 36-3 at 165. Ryan Merfeld also reported that he first noticed smoke and flames between the wall of the camper and where the kitchen was located in the camper. Doc. Nos. 36-3 at 167; 26-3 at 106. Plaintiffs argue that these accounts are sufficient to show there was no prejudice because the fire clearly started at the RV and the RV itself was preserved. However, the existence of these eyewitness accounts do not change the fact that the Dometic was deprived of the opportunity to investigate other possible causes. According to Oliveaux, because of the cleanup there was "extremely limited evidence to verify the statements provided by all parties and virtually no evidence to support any statements of Ryan Merfeld." Doc. No. 26-3 at 107–08.

Clearly, the fire scene is the unique and primary source of evidence concerning the cause of the fire. The significant disturbance that occurred in this case was prejudicial to Dometic. *See Stevenson*, 354 F.3d at 748. Thus, but for the lack of evidence establishing an intent to destroy evidence, I would find spoliation to be an alternative basis for dismissal.

## VI.    CONCLUSION

For the reasons set forth herein:

1.     Defendant's motion (Doc. No. 26) for summary judgment is granted in its entirety and all claims are hereby dismissed with prejudice.

2.     Trial, currently scheduled to begin July 23, 2018, is hereby canceled.

3.     Judgment shall enter in favor of the defendant and against the plaintiffs.

4.     Defendant's motion to dismiss (Doc. No. 28) for spoliation of evidence is denied as moot.

**IT IS SO ORDERED.**

**DATED** this 25th day of January, 2018.

_____
Leonard T. Strand, Chief Judge